```
UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------x
ACE HARDWARE CORPORATION,

                         Plaintiff,

vs.                                        Case No.
                                           06-CV-5335
MARN, INC., D/B/A ARNOLD'S ACE HARDWARE
and MICHAEL R. ARNOLD,

                         Defendants.

------------------------------------------x
```

   Deposition of MICHAEL R. ARNOLD, held on June 13, 2007, commencing at 8:25 a.m. through 3:07 p.m., at the Ramada Inn, 1305 Buckley Road, Syracuse, New York, before Joi L. Small, Registered Professional Reporter and Notary Public in and for the State of New York.

               A P P E A R A N C E S

| | |
|---|---|
| For Plaintiff: | THE FISH LAW FIRM, P.C.<br>Attorneys at Law<br>Suite 200<br>1770 North Park Street<br>Naperville, Illinois 60563<br>BY: DAVID J. FISH, ESQ. |
| For Defendants: | RUNES LAW OFFICES, P.C.<br>Attorneys at Law<br>Suite 104<br>800 W. Central Road<br>Mount Prospect, Illinois 60056<br>BY: KENNETH A. RUNES, ESQ. |
| Also Present: | Paul Arceci |

**EXHIBIT A**

```
 1    A    Yes.
 2         MR. FISH:  Object to the foundation and
 3         form.
 4    Q    Did you ever get the conversion loan?
 5    A    No.
 6    Q    Do you know why not?
 7    A    I do not.
 8    Q    I want to direct your attention to Exhibit C.
 9  And this is page 6, paragraph 16.
10         MR. FISH:  Which paragraph?
11         MR. RUNES:  16, the second paragraph of
12         the fraudulent misrepresentation.
13         MR. FISH:  Okay.
14    Q    Have you seen that paragraph before?
15    A    Yes, I have.
16    Q    And earlier you testified that you had no
17  knowledge -- and if I'm quoting you wrong, please tell me so.
18         MR. FISH:  I don't remember what I said.
19         MR. RUNES:  No, not you.  Him.
20         MR. FISH:  Oh.
21    Q    -- of any intentional misrepresentations by
22  ACE.  Is that what you testified to?
23    A    I said that I believe that none of the people
24  that I talked with, the people that I communicated with, I
25  believe that none of them were guilty of intentional
```

200

1 misrepresentation.

2 Q   Okay. Now, you see paragraph 16, the one I
3 just directed you to, right?

4 A   Yes.

5 Q   How do you reconcile to what you just
6 testified to the content of that paragraph?

7       MR. FISH: I object to the foundation.

8 A   I reconcile that because there -- it's my
9 belief that I'd been told by ACE people that -- that people
10 behind the scenes made decisions to deny me previously
11 promised treatment by ACE. And so my statement that I -- I
12 didn't believe anyone had actually intentionally
13 misrepresented anything to me remains true.

14 Q   Okay. Where is Rome, New York from where we
15 are?

16 A   It is kind of due east, about 40 miles.

17       MR. FISH: From where we are or from
18            where his store is.

19 Q   From where we are in Syracuse, New York. Is
20 that the --

21 A   That's the answer.

22 Q   Okay. So it's roughly east of Syracuse,
23 New York?

24 A   That's correct.

25 Q   How different is that market in terms of

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ACE HARDWARE CORPORATION, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | Case No. 06 CV 5335 |
| | ) | |
| v. | ) | Hon. Amy St. Eve |
| | ) | |
| MARN, INC. d/b/a ARNOLD'S ACE HARDWARE and MICHAEL ARNOLD, | ) | Magistrate Judge Brown |
| | ) | |
| Defendants/Counter-Plaintiffs. | ) | |

**AFFIDAVIT OF MICHAEL R. ARNOLD**

Affiant Michael R. Arnold states as follows:

1. I am Michael R. Arnold. I am of legal age, sound mind and have personal knowledge of all matters stated herein.

2. I am and have at all times since its formation been the President of MARN, Inc. MARN's sole business is a hardware store located in Cortland, New York, which has been known since October of 2006 as Arnold's Hardware.

3. During MARN's membership in Ace Hardware, many of its orders were either cancelled or partially cancelled under the ADSO (Automatic Deletion of Stock Orders) program.

4. In addition to ADSO being applied when MARN had allegedly exceeded its credit limit, MARN also experienced orders or parts of orders cancelled automatically by ADSO under the following circumstances:

a) ACE failing to maintain consistent units of measure in inventory programs, resulting in (for example) an order for a bucket of chain (143 feet) being interpreted by the program and charged to MARN as 143 buckets of chain and an order of 20 pipe clamps being converted by the program and charged to MARN as an order for 2000 pipe clamps;

EXHIBIT B

b) Charges due to errors as described in subparagraph a) remaining on MARN's account for weeks if not months without being credited, resulting in the charge of additional interest and in the continuing appearance that MARN was over credit limit.

5. MARN in reality did not have a set credit limit with ACE; ACE routinely and arbitrarily modified the credit limit upwards or downwards based on multiple factors including holidays, seasons, direct ship orders, whether MARN used dating invoices, MARN's ratio of current to future obligations, etc.

6. Each time an order was fully or partially cancelled due to computer invocation of ADSO, MARN suffered damages from:

a) Sales not made because inventory had not been replenished;

b) Charges to MARN for a transportation of a separate truck;

c) Time invested by myself and MARN's staff, typically in excess of five hours per weekly order, in getting errors corrected and the order released; and

d) Loss of good will from customers whose special orders were dropped from shipments, or who had come to the store to purchase normally inventoried goods.

In addition, on several occasions when ACE later filled the order, some merchandise was no longer available and was not provided.

7. During negotiations for MARN to become an ACE member, several representations were made to me by ACE employees Steve Chute, Audrey McGovern, Paul Arceci and Alex Raymer (among others) that:

a) Chute would be present in the Cortland store at least one day per week for the first six months following conversion, to assist MARN in its transition to ACE membership; replacing Marn's dead and non-productive inventory with active and productive goods, and implementing

a new layout of "product adjacencies" to be designed by Ace.

b) McGovern would regularly appear at the store to provide instruction and guidance on store displays, organization and marketing;

c) ACE would provide training to MARN's staff with regard to use of ACE's internet and software systems; and

d) The application of ADSO to MARN would be reviewed after six months of membership if MARN was current in its account with ACE.

MARN was current in its account with ACE for its first two years of membership.

I relied on each of these representations in deciding to have MARN become an ACE member and in deciding that I would personally guaranty MARN's liability to ACE. ACE failed to comply with each of the above representations.

8. During negotiations for MARN to become an ACE member, several representations were made to me by ACE employees Steve Chute, Audrey McGovern, Paul Arceci and others that:

a) ACE would provide MARN with a conversion loan to assist in converting the store from True Value to Ace; and

b) ACE would provide a loan for securing ACE signage.

I relied on each of these representations in deciding to have MARN become an ACE member and in deciding that I would personally guaranty MARN's liability to ACE. ACE failed to comply with each of the above representations.

9. I was approached by ACE in 2003 to make MARN, Inc. an ACE member. ACE had contacted me about membership in 1999 and 2002 as well and was aware when it approved MARN's ACE membership that:

a) MARN had been a TruServe member;

b) MARN was in an ongoing dispute with TruServe particularly as it related to errors in stocking and restocking the store.

10. On September 1, 2006, Gordon Hampton by telephone promised me that ADSO would not be applied to MARN's order of September 3, 2006. ADSO was in fact applied to that order. I addressed my frustration with this and with ACE's failure or refusal over several months to credit back MARN's account for errors in prior orders in an e-mail to Hampton dated September 11, 2006, in which I advised Hampton that I had stopped payment on the most recent check. In subsequent correspondence, I offered to pay for MARN's orders on a COD basis and continued my attempts to resolve the unpaid credits issue. ACE responded by terminating MARN's membership and suing without further communication.

11. During the course of this litigation, I had conversations with counsel for me and MARN about the adviseability of retaining an accountant who could analyze, quantify and testify to damages suffered by MARN and me as alleged in the Counterclaim. I was unable to afford (as was MARN) such a witness due to the financial distress MARN and I experienced after the termination of the ACE membership and continuing through this day. This financial distress was related not only to the cost of litigation but a downturn in business for MARN which has gotten drastically worse since my deposition on June 13, 2007 and, to a lesser extent, health issues I have been addressing since early July, 2007.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Michael R. Arnold

Subscribed and sworn before me
this ___ day of November, 2007.

_____
Notary Public
My commission expires May 15, 2010

KAREN Q. SNYDER
Notary Public, State of New York
No. 01SN6042076
Qualified in Cortland County
Commission Expires May 15, 20 10

**Mike Arnold**

From: "mike arnold" <arnoldsace@cnymail.com>
To: "Hampton, Gordon " <Ghamp@acehardware.com>; <jhill@acehardware.com>
Cc: "mike arnold" <arnoldsace@cnymail.com>
Sent: Tuesday, September 12, 2006 10:22 AM
Subject: relationship

Marn, Inc.

d/b/a Arnold's Ace Hardware            EXHIBIT C

942 Route 13 - Tompkins Street

Cortland, NY 13045

Phone 607-756-7903 Fax 607-756-7347


September 11, 2006


Gordon Hampton Via Email, Facsimile and Post

Regional Credit Manager

Ace Hardware Corporation

2200 Kensington Court

Oak Brook, Il 60523-6600

Dear Mr. Hampton:

I am in receipt of your letter of September 1, 2006 which purports to record our telephone conversation of that day. Said letter was postmarked September 5th and I received it Saturday, September 9, 2006. I have the following response:

Early in our conversation on the 1st you stated you wanted the "current" portion of the statement paid when due, from now on. My response was that I could not always do that and specifically could not on the next due date because I also had a quarterly sales tax payment due the State of New York, and did not have funds sufficient for both. I also remarked that the next due amount with you contained dating invoices, making the payment inordinately high. Your response was then that you wanted me to commit to payment of your referenced $11,009.75 by September 8th. I indicated that although that was my goal, I could not promise that as my ability to pay it depended largely on revenues generated by the September Best Buys and the Labor Day Sale, both of which would run over the weekend. You then asked me if I would at least try to pay the figure by September 8th. I responded that I would do that

anyway, even absent the conversation, although the Labor Day Sale flyer seemed steeped in promoting Ace's paint rather than the members' inventory investments.

The telephone conversation was what has become to be a ritual end of week talk, under the threat of application of ADSO. Although I feel these conversations elementary, an understanding and accord was reached and you specifically committed that you would release my forthcoming September 3rd order from being subjected to ADSO.

We also talked, as usual, about a number of other things. I indicated that while my payments presently may not meet some past due/current due/future due formula, I was consciously paying more than I was purchasing, and therefore, was lowering the total debt. I advised you that my business was the closest ever to being profitable, a result of a workhorse attack at reducing expenses, as well as looking at getting new customers in from different approaches, and a new plan of not allowing Ace to control margins, as well as discontinuing the regional flyers that Ace often does not support with warehouse inventory, in favor of the Best Buy flyers, where we offer higher visibility items with better warehouse support.

We talked again over my disappointment that you continue to threaten and apply ADSO after reneging on conversion funds, and while the statement is overdue credits which Ace continually ignores, in the setting of inconsistent order multiples, and given the many times Ace has "forgotten" to send my flyers. The most recent time Ace forgot my flyers was two months ago, leaving me with thousands of dollars of merchandise and no advertising. I reiterated the many times we have suffered the application of ADSO and that each time, RFS had released the shipment of items already cut. I reiterated that every application of ADSO harms my business, whether you eventually authorize shipment or not - that it creates credibility issues and bad will with my customers, is never "corrected" accurately or timely, that it worries my employees and negatively impacts my ability to pay obligations, together with increasing handling and transportation costs (which also cost me) - Simply that nothing positive occurs out of it, either to Ace or my company. I also told you I was working on a letter which I hoped would cause the intervention of the Board of Directors. I also stated that it would be nice if you could propose something positive and helpful, instead of constantly menacing my business.

I also indicated that I have to spend a considerable amount of time each week, often as much as two days, protecting my business from Ace. In support of that, I indicated that it took me over two years to get my $3,000.00 Pratt & Lambert OSO credit. I questioned how many members may not even know they have such a significant credit available, and further questioned what Ace is doing with the money. I also reminded you that only a few weeks ago, you made a mess of my statement by arbitrarily applying an overpayment to invoices I had not approved, and without my knowledge.

Applying ADSO and then releasing the shipment, a dozen times, is financial terrorism. One of life's simplicities is that, contrary to what you claim, it is clear you are trying to drive my company out of business. Nobody "forgets" to send flyers (and apologises and promises to ship them and STILL doesn't) several times a year and NOBODY applies ADSO twelve times by mistake.

Further contrary to your representation, my order of September 3, 2006 was cut by ADSO, representing further reneging on your part. On Friday September 8, 2006, I submitted a payment of $11,697.34, in compliance with what I had represented I would try to do.

On Saturday September 9, 2006 I became aware of your letter representing further reneging and setting a standard you knew on the day of authorship, I could not meet. It seems a shame at this juncture, when my business is finally, after seven years, showing signs of success, that you now destroy it. I consider your letter and the application of ADSO on September 3, 2006 dishonest and simple "bait and switch".

11/25/2007

Page 3 of 3

Certainly setting a credit limit of $40,000.00 for a 16,000 sq.ft. store is unrealistic, (you have admitted several times that it is too low) even given your "horse and rabbit burger" formula for allowing charges above that level. Indeed, absent any "financials" whatsoever, you have allowed that figure to increase to as much as $91,000.00 in the past. Now when I owe only approximately 65% of that historic high, with a two year history of successfully paying that down, and knowing that I am closer to profitability than ever before, and further knowing that it is not possible to pay the "current" portion of my statement on the specific date of September 12, 2006, you suddenly require that I do just that, on three days notice.

A literal reading of your letter tells me that when I can't pay you $20,000.00 on Tuesday September 12, 2006, you will no longer allow me to purchase. On my planet, which seems inhabited by everyone except Ace Hardware Corporation, this is a malicious attempt to put me out of business.

Quite frankly, I am disappointed that you have now joined the others at Ace who are incredible, but relieved that your motivation is now so visible. You simply cannot provide a justification for

what you are doing.

Accordingly, I reject your letter of September 1, 2006, together with your continuing malicious treatment. I have stopped payment on the most recent transfer of $11,697.34 in order to recoup some of the funds you have reneged on together with the overdue credits that Ace has continually ignored. I expect to receive the balance, together with compensation for being the object of your malice. If an Ace officer or officers of appropriate authority wish to work this out, I am agreeable to participating in that process. I am also prepared should Ace choose another course.

Sincerely,


Michael R. Arnold

President

11/25/2007

Page 1 of 1

## Mike Arnold

**From:** "mike arnold" <arnoldsace@cnymail.com>
**To:** <jhill@acehardware.com>
**Cc:** "mike arnold" <arnoldsace@cnymail.com>
**Sent:** Tuesday, September 19, 2006 11:34 AM
**Subject:** relationship

jim -

i wanted to give you an update in order that someone at Ace know what's going on at this end

i have received no response to my letter of September 11, 2006 - that makes me wonder if RFS is keeping it to themselves or forwarding it to the proper level - as it should be. in any event, i consider the non-response unprofessional. i have certainly seen my share of Ace people sticking their heads in the sand.

today was to be the delivery day for the order sent in on sunday. my order was cancelled by someone before it reached wilton - EXCEPT that i received a bulletin shipment. does Ace expect me to pay for bulletin orders while withholding regular replenishment orders?

now, when RFS thinks they have justification for and intends to apply ADSO, they screw it up!!!!!

this issue is critically import. to both Ace and me, and needs mature responsible thinking on your side to resolve it. i cannot wait for product much longer. if i have to move away from Ace, it will be too late for resolution at this level. i would think that we could work out some agreement for Ace to continue selling and me to continue purchasing - on a COD basis. for instance Ace could deliver the weekly order on thursday and get paid for the total delivery this week, including the bulletin order.

for the above reason, i ask that you forward this communication, together with my September 11 letter, to the appropriate person or persons.

thank you,

mike

EXHIBIT D

11/25/2007

**ACE**

**Ace Hardware Corporation**  2200 Kensington Court
Oak Brook, Illinois 60523-2100
(630)990-6600

September 5, 2007

Dear Ace Retailer:

Today, I want to provide you with an update on a very serious, yet manageable, situation. We have discovered an accounting error that could ultimately result in a significant adjustment to the company's financials.

This is my attempt to explain the details we have. There are many details we simply do not know at this time, but you deserve to know the facts as we know them today.

As you know, we have been seriously considering a transition of Ace moving from the "cooperative model" to a "traditional corporation." This proposed transition would require us to register with the Securities & Exchange Commission (SEC). In that effort, our own management team uncovered an accounting error that causes us concern.

As soon as I learned of this issue, I informed your Board of Directors and, with their active involvement and recommendation, we engaged Protiviti Inc., an independent consulting firm with significant expertise in inventory reconciliation matters. They are assisting us in identifying the exact cause, extent of and solution to this problem. That analysis is currently underway and, because of the complexity of the situation and our need to be as thorough as possible, could take several months to complete.

The issue we initially discovered, and which Protiviti has since confirmed, involves a reconciliation of the difference between our company's 2006 "general ledger" balance (our primary method for recording financial transactions) and our "perpetual inventory" balance (our actual inventory records). Currently, this difference amounts to approximately $154 million. However, with the work that is underway to clarify these entries, we expect the final adjustment to be less.

This is not a one-year issue; the error accumulated to this point over a number of years, probably five at least. At this time, we have no reason to believe there are any other significant problems in our financial statements/reporting. We have been reviewing tens of thousands of accounting entries in our ledger, and want to be absolutely sure there are no other issues.

There are several ways this adjustment could financially affect retailers. Most or all of our 2007 profits/patronage dividends might be applied to offset the expected financial adjustment. However, until we know the exact amount, we cannot be certain this would be entirely sufficient and that this is the approach we will ultimately take.

(over)

EXHIBIT E

Your Board of Directors, the officer team and I are all firmly committed to resolving this issue in a way that has the least negative impact on our retailers.

As difficult as this news is, it is equally important for us not to lose sight of the inherent strength of this business. Ace's financial position, business and operations are fundamentally strong. This issue does not change that. Our balance sheet is sound, earning power and cash flows are very strong, service levels remain high and our revenues are running ahead of last year. At retail, same-store sales are outpacing our big-box competitors.

As we work through these issues, there are several other key facts I think are important for you to know:

- There is no evidence of theft or missing inventory. We believe this issue is solely the result of an error in accounting. Unfortunately, the error was incorporated into our accounting systems and continued to grow until it was detected.
- We have informed our bankers about this issue and they have given us their understanding and financial support.
- This issue will not impact Ace's ability to provide you with the merchandise and services you expect from Ace; we will continue serving all of our retailers as we do today.
- In addition to internally certifying our own financials every year, Ace's auditors, KPMG, provided clean audit opinions on our financials for each of the years 2002-2006.

This is a substantial issue that we need to resolve and work through. Consequently, we will not be pursuing the change from a cooperative to a corporation in the near future. We need to find and fix this immediate problem, and it is our top priority.

I am truly sorry and saddened that this problem occurred and I want to personally apologize to you for it.

As your chief executive officer, I take responsibility for this situation and am personally committed to working with the Board, Ace's management team and outside experts to find out exactly what happened, why it happened, and put processes in place to ensure something like this never happens again.

I promise to keep you informed as we learn more facts and to keep communicating with you until this matter is fully resolved. We have conference calls planned and have posted the dates and times on ACENET for your participation.

Feel free to email me or call me directly, and I will respond. I also encourage you to contact any one of our officers. Their email addresses and phone numbers are posted on ACENET.

Sincerely,

Ray Griffith
President and CEO